### IN RE EMMANUEL M.*

SUPERIOR COURT
JUVENILE MATTERS

---

* Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 1060.1.

HANDY, J. On January 11, 1993, the petitioner, the commissioner of the department of children and youth services, now the department of children and families (DCF), filed an affidavit seeking an order of temporary custody and coterminous petitions against the respondent mother and father, alleging grounds for commitment to DCF, and for the termination of parental rights of the respondents regarding Emmanuel M.

The coterminous petitions allege that the minor child is neglected in that: (1) the child has been abused, in that he has had injuries inflicted on him other than by accidental means; (2) the child has injuries that are at variance with the history given of them and is in a condition that is the result of maltreatment; (3) the child has been neglected, in that he is denied proper care and attention, physically, and is being permitted to live under conditions, circumstances and associations injurious to his well-being.

The termination petition itself is based on General Statutes § 17a-112 (b) (3) and (4) as to both respondents. That statutory language specifies termination if "(3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."

The statutory authority for a coterminous petition is found in General Statutes § 46b-129 regarding neglect and in § 17a-112 regarding the termination of parental rights.

# I

## PROCEDURAL AND FACTUAL BACKGROUND

The minor child, Emmanuel M., was born on December 17, 1989. His biological mother, Doris M., is the sister of the respondent father. His biological father's identity is unknown. On November 2, 1990, the respondents adopted him through proceedings in the New London Probate Court.

On January 3, 1993, Emmanuel was admitted to the naval hospital at the U.S. submarine base in Groton (naval hospital) with multiple injuries. According to hospital records, Emmanuel had "two bruises to head, one on frontal area, one on left parietal region, a burn on the left ear and on the left side of the face, a second to third degree burn to his right thigh, bruising to his right and left upper arms, a spiral fracture of the right femur and multiple scars on his body."

Subsequent to this admission, on January 3, 1993, the hospital staff treating Emmanuel felt that "due to multiple abrasions and contusions and delay in treatment, abuse is suspected." Following hospital policy and procedure, DCF was called by hospital personnel to report an allegedly abused child. DCF filed a coterminous petition eight days later, on January 11, 1993.

# II

## BURDEN OF PROOF AND PROCEDURE TO FOLLOW

### A

#### PROCEDURE ON PETITIONS

When neglect and termination proceedings are coterminously filed, the court is required to proceed in three separate stages:

## 1

### Adjudication of the Neglect Petition

The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 263, 471 A.2d 1380 (1984). If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition is deferred until a decision is made on the termination petition.

## 2

### Adjudication of the Termination Petition

The court must determine next whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parents' rights, as of the date of the filing of the petition or as of the date of its last amendment. If no such ground for termination is found, the court must proceed on the neglect petition and consider an appropriate disposition. If at least one alleged ground to terminate is found, however, the court must move on to the third stage.

## 3

### Disposition of Both of the Petitions

If grounds have been found to adjudicate the child neglected or uncared for, *and* to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial establish, *by clear and convincing evidence,* after consideration of the factors enumerated in § 17a-112 (d), as amended, that termination is in the child's best interest. If the court does not find that the

child's best interest would be served by terminating parental rights, it must return to, and dispose of, the neglect petition. If the court does find that termination serves the child's best interest, an order shall enter terminating parental rights.

## B

### STANDARDS OF PROOF

A fair preponderance of the evidence standard of proof is the proper standard in neglect proceedings. *In re Juvenile appeal (84-AB),* supra, 192 Conn. 264.

With regard to "termination of parental rights," that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child." See General Statutes §§ 17a-93 (e) and 45a-707 (g). Termination of parental rights is a judicial matter of exceptional gravity and sensitivity. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979).

Both the child and the parents have a constitutionally protected interest in the integrity of the family. *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The rights of parents to the custody of their children is an important principle that

has constitutional dimensions. *In re Juvenile Appeal (Docket No. 10155),* 187 Conn. 431, 435, 446 A.2d 808 (1982).

The constitutional guarantee of due process of law requires that the statutory grounds for termination of parental rights be established by "clear and convincing evidence," not merely a fair preponderance of the evidence. *Santosky* v. *Kramer,* supra, 455 U.S. 769. Both § 17a-112 (b) and Practice Book § 1049 mandate the standard of proof as "clear and convincing evidence." *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 473 A.2d 79 (1984).

Termination of parental rights proceeds in two stages: adjudication and disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. *In re Juvenile Appeal (84-AB),* supra, 192 Conn. 262; *In re Nicolina T.,* 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); *In re Luke G.,* 40 Conn. Sup. 316, 324, 498 A.2d 1054 (1985). Only upon establishment of one or more of the statutory grounds may inquiry be made regarding the ultimate best interest of the child. Since § 17a-112 (b) sets forth the statutory grounds for termination in the disjunctive, however, one ground only need be established for the granting of the petition. *In re Juvenile Appeal (84-BC),* 194 Conn. 252, 258, 479 A.2d 1204 (1984); *In re Nicolina T.,* supra, 602.

### III

#### FINDINGS OF FACT

Trial was held on the petition on September 17, September 24 and October 1, 1993. At trial, the petitioner introduced testimony and exhibits through the following witnesses: Joseph E. Lellman, M.D., emergency

room physician at the naval hospital; Robert D. Meier, Ph.D., psychologist; Phil Fazzino, youth officer for the New London police department; Michael A. Nelken, M.D., psychiatrist; Elizabeth Ball, DCF investigation worker; and Lorraine Semmelrock, DCF treatment social worker.

The respondent mother introduced testimony and exhibits through Lucille Flowers, a family friend who formerly lived with the respondents and the child. No other party presented any witnesses.

All parties stipulated to exhibits of a series of seven photographs of the minor child at the time he was seen in the emergency room of the naval hospital. The parties also submitted a written stipulation to facts, dated September 17, 1993, which provided this court with the following:

(1) Emmanuel M. was born December 17, 1989, to Doris M., sister of the respondent, Carlos M. The identity of his biological father is unknown. On November 2, 1990, Emmanuel M. was adopted by the respondents, Martha and Carlos M.; (2) On January 3, 1993, Emmanuel M. was admitted by his mother and father to the naval hospital with a spiral facture of the right femur, bruises to the forehead and top of the head, bruising to the right and left upper arms, bruising on the back, abrasions to the left ear and left side of his face, second to third degree burn to the right thigh, multiple scars on his entire body, and a cigarette-size burn on the right wrist. Bruises were at various stages of healing; (3) On January 3, 1993, Harriet Ivey, an after-hours social worker, went to the naval hospital and saw Emmanual M. In addition to the original referral, she noted scars on his back, red marks on each wrist that appeared to be strap-like, blisters between the fingers, a burn the size of a cigarette on the right hand, a burn on the right thigh, a strap-like mark above the

eyebrows, scratches in the underarm area, belt or strap mark across the shoulder, and a left ear area extremely torn and bruised and possibly burned; (4) On January 5, 1993, a foreign material was removed from the left ear of the child. This material was examined by a police laboratory and was found to be candle wax and not ear wax; (5) Emmanuel M. lived with the respondents in New London at the time of his admission to the naval hospital on January 3, 1993. Lucy Flowers also lived in the residence; (6) Carlos M. had been diagnosed with shared delusional paranoid disorder.

Lellman, the emergency room physician at the naval hospital, testified that upon presentment on January 3, 1993, Emmanuel had various abrasions, contusions and lacerations to various parts of his body, second to third degree burns on his right thigh, a smaller, cigarette-size burn on his right wrist and extreme swelling and tenderness to his right thigh resulting from a mid-shaft spiral facture to the femur. Subsequent examination over the course of Emmanuel's treatment showed that his right eardrum was perforated and that his left ear had a foreign object in it. This substance was later removed and identified as candle wax.

Lellman testified further that the respondents, who accompanied Emmanuel to the hospital, initially reported that their son had fallen down the fire escape the day before, approximately thirty-six hours prior to the admission. Lellman stated that it was unlikely that any of Emmanuel's bruises, contusions and lacerations occurred with the thirty-six hour period prior to his admission. He also stated that, based on his experience, the spiral fracture was less than ten days old and due to the amount of swelling, had occurred earlier than the thirty-six hour period prior to admission. Lellman opined that a femur is difficult to break and it was highly unlikely that such an injury could have occurred by the fall described by the respondent. As to the other

specific injuries, he said the bruises to Emmanuel's face were "in the healing stage," the bruises to his chest were "very old" and the inner thigh wounds were five to seven days old.

Finally, Lellman concluded that immediate treatment for Emmanuel's leg should have been sought. He stated that a femur fracture in a small child constitutes a severe injury that causes great pain and could produce a deformity. Lellman felt even a layperson could not mistake the extent of injury to Emmanuel's thigh. Lellman clearly stated that the injuries were not consistent with the time frames described by the respondents and were unlikely to have occurred from a fall down the fire escape stairs.

Fazzino, youth officer for the New London police department, testified that he was called to the naval hospital on January 3, 1993, after Emmanuel's admission to investigate suspected abuse. Fazzino took photographs of Emmanuel, interviewed the respondents, and attempted to interview Emmanuel on January 3, 1993.

Fazzino also prepared an affidavit in the normal course of his business procedures which detailed his observations of the emergency room on January 3, 1993, and his interviews with the respondents on that date and on subsequent dates. The father originally told Fazzino that his son fell down seven steps of a rear fire escape onto a landing. The father later told him that Emmanuel fell seven steps then fell through the steps and dropped to a landing. The mother later told him that Emmanuel fell down two sets of seven steps, a total of fourteen steps.

The respondents told Fazzino that the child had no injuries on Thursday, December 31, 1992, received the injuries on Friday, January 1, 1993, and that they heard no complaints from Emmanuel when he was bathed on

Saturday, January 2, 1993. Fazzino stated that he went to the respondents' home to observe the fire escape. He testified that Emmanuel could not have fallen through the steps as the father had claimed because only a seven inch space existed between the steps.

While at the emergency room on January 3, 1993, Fazzino attempted to interview the child while the respondents were in the room. Emmanuel did not look at them and did not seem upset when they left the room. Fazzino testified that Emmanuel was in pain and Fazzino thought it unusual that Emmanuel would not want his parents in the room to comfort him.

In subsequent conversations with the mother, Fazzino reported that she told him that the wax removed from Emmanuel's ear was from a voodoo ritual performed by her mother-in-law. Fazzino indicated that both the mother's and the father's stories changed regarding physical discipline with Emmanuel. Fazzino also testified that the mother reported to him that she did not take Emmanuel to the hospital because she did not want the father to be angry with her, but that this story also changed frequently.

Ball, investigation worker for DCF, met with the respondents on January 4, 1993. She stated that their stories about Emmanuel's injuries changed several times that day, were inconsistent and were changed again subsequent to January 4, 1993. Ball interviewed Emmanuel at the hospital, initially in the presence of the respondents. She testified that while the respondents were in his room, Emmanuel did not look at them. When a nurse entered, Emmanuel repeated, "I'm sorry. I'm sorry." After the respondents left Emmanuel's room, Ball asked him how he had gotten hurt. His response was, "I was a bad boy. I messed my jammies." When asked "Would you like your mother back in the room now?" The child again responded,

"No." Ball testified that she thought it unusual for a child in a hospital not to want his parents.

Ball conducted a second interview with the resondents separately on January 8, 1993. At that time, the mother told Ball that her mother-in-law "stopped the voodoo in Emmanuel's ear" with the candle wax. The respondent also told Ball that she was concerned about a man who had attacked her and about a conspiracy allegedly in progress. The father told Ball that Emmanuel's many cuts and bruises were from running into a cupboard door, being burned from a cigarette and hitting his head under a table.

Ball had personal follow-up contact with Emmanuel on the day he left the hospital and was placed in foster care. She testified that he was then in an extensive body cast and whimpered when he was moved, repeatedly saying, "I'm sorry. I'm sorry." When told he was going to live elsewhere for a while, he never mentioned his mother or father or mentioned going home with them. She concluded that shortly thereafter, DCF filed coterminous petitions, feeling irreparable damage had occurred to Emmanuel and permanancy planning was needed for a child of his young age.

Semmelrock is a DCF treatment social worker who was assigned this case on January 26, 1993. One of her responsibilities included supervising visitations between Emmanuel and the mother. During the first visit, Semmelrock testified that Emmanuel was somewhat guarded toward his mother. The mother fed him food which she had prepared and he promptly regurgitated it. During follow-up visits, Semmelrock stated that the child seemed happy to see the mother if she was already at the visitation site when he arrived. If the child was already engaged in an activity at the site, however, he neither showed much interest in the mother nor seemed to want to share his time with her. There has been no

visitation with the father since the latter's incarceration in February, 1993. Semmelrock stated that Emmanuel never asked to see his father and never brought up his name.

Semmelrock further testified that the mother's explanations for Emmanuel's various injuries were inconsistent and contradictory. The mother told her first that Emmanuel had fallen down the stairs. She later told Semmelrock that the injuries to Emmanuel's head had been there since he was born. The mother stated that injuries to Emmanuel's ear were from "worms that had hatched" in his ear and from other worms which would "suck the skin around the ear." The mother told Semmelrock that Emmanuel started having behavioral problems after a visit to her mother-in-law in Puerto Rico in May, 1992. Subsequent to that, the mother-in-law visited the United States in November, 1992, and after that visit, Emmanuel had "scratches on his chest and his personality had changed." The mother said she did not seek treatment for Emmanuel at that time.

Semmelrock testified that DCF provided the mother with the following services: individual therapy, weekly visitations with Emmanuel, and, through her Alternate Incarceration Program (AIC), coordinated parenting classes, nutrition classes and family in crisis and parent in crisis classes. The respondent mother's participation in the AIC program required daily attendance. DCF was not in a position to offer the father any services. He has been incarcerated since the outset of the incident. He did previously receive medical attention at the U.S. naval hospital in Bethesda, Maryland, and he continues to receive counseling as a patient-inmate on a medical ward at the correctional facility.

Semmelrock stated that Emmanuel has limited emotional ties with his mother. He separated from her easily and does not ask for increased visits. Emmanuel

does not appear to show any deep level of bonding with his mother, and he does not look to her for comfort. Emmanuel's emotional ties with his father are even more limited. Although he did take a photograph of his father from his mother's purse, he has never asked about his father.

As DCF's representative, Semmelrock felt that the respondents have done nothing to change and to allow Emmanuel to return home. While both respondents did follow through and cooperate with court-ordered examinations, results of those examinations conclude Emmanuel should not be returned home. In Semmelrock's opinion, neither economics nor other factors prevented the respondents from maintaining a relationship with their child. She testified further that she had regular contact with the foster parents and that Emmanuel was attending nursery school on a regular basis and receiving speech and language therapy once a week.

Semmelrock then testified that the respondents later again changed their respective stories about Emmanuel's injuries. The mother told her that his ear injury was caused by a contaminated cotton swab and that the only injury he sustained from his falling down the stairs was the fracture to his leg. The father sent a letter stating that he assumed responsibility for the child's injuries, but he could not remember how he caused them. He did continue to claim, however, that some of the injuries occurred from the stairs incident. Semmelrock also met on several occasions with Flowers, a family friend who had previously lived with the respondents and Emmanuel. Flowers' stories were also inconsistent as to the cause of Emmanuel's injuries. She said bruises would appear on the child's body between 12 p.m. and 1 a.m. and then simply disappear. At one time, she claimed all of Emmanuel's injuries were her responsibility. At another time, she stated

that some of the child's injuries were from a seashell she had left in a jar containing cotton swabs.

Semmelrock concluded that visitation with the father was not advisable due to his mental health, the discharge summary of the Bethesda naval hospital and Meier's report. In her opinion, it was not in Emmanuel's best interest to wait and see if either or both parents rehabilitated themselves, and reunification was not advisable based on her review of the respondents' evaluations, the services the family had already utilized and the quality of the relationship between the parents and the child.

Meier testified that he conducted two evaluations; one on March 6, 1993, and a follow-up on August 10, 1993, which included interviews with both respondents. Meier commented that both parties were inconsistent in their interviews. There was inconsistency on the mother's part regarding her son's injuries and her report to him about "voodoo" in the house. The father told Meier that he heard voices, admitted responsibility for all of his son's injuries, claimed his wife was psychic and that they communicated with the dead.

Meier concluded that the mother has some dissociative tendencies and a split personality, requiring long-term therapy. The father has a psychotic disorder requiring long-term therapy and medication. He has dangerous and delusional thoughts. Meier felt that due to those serious disorders, neither respondent could independently parent a child, and, due to their shared delusional behavior, it was unlikely they could parent a child together. In fact, Meier testified that the respondents promote each other's delusional thoughts. Meier determined that even though the mother's concern and love for the child are genuine, neither respondent could achieve rehabilitation in time to provide Emmanuel with the stability and permanancy he needs at this stage

of his life. The mother is easily influenced by others, and this would affect her parenting in that she may not treat Emmanuel correctly. Further, she does not have the independent ability to parent a child. Meier's August 10, 1993 report states in part:

"17. Considering the age and needs of the child, provide an opinion as to whether the parents can achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time they could resume a responsible position in the life of the child.

"It is unlikely that the parents can sufficiently rehabilitate themselves to a degree they could provide a suitable home and resume a responsible position in the child's life.

"18. Is there an ongoing parent/child relationship? Does the child have present positive memories or positive feelings for the biological parents?

"There are serious questions as to whether there is an ongoing parent/child relationship at this time. Emmanuel was quite guarded in the presence of his mother, but also showed some affection. His speech is very limited, and it could not be determined whether he had positive memories. Mother clearly has not provided for the basic needs for safety of the child.

"Child was not evaluated with father given father's unstable emotional state.

"19. If there is no indication of a parent/child relationship, might it be detrimental to the best interests of the child to allow further time for the establishment or reestablishment of a parent/child relationship? Explain the reasons for your opinion.

"20. Provide an opinion regarding permanency with regard to placement of the child at this time.

"Given the child's age and need for stability, it does not appear to be in the child's best interest to remain in temporary placement for the extended period of time expected for parents to improve their emotional status to the degree they could care for and parent this child."

This court accepts as facts Meier's conclusions and recommendations in this report.

Finally, the court heard testimony from Nelken, a psychiatrist specializing in work with children and families, who had conducted a psychiatric evaluation of the mother. Regarding the mother's mental status, Nelken's written evaluation states in part: "Affects are severely and rigidly controlled to mimic conventional appearance. Intelligence is within the normal range. Insight is lacking and her delusions reign unquestioned. Judgment is impulsive and driven." Nelken diagnosed the mother as suffering "from schizotypical and dependent personality disorders." He testified that she makes decisions without thought and in a harried fashion. She does not weight alternatives or make prudent judgments. He characterized the mother as a "frightened individual" with a "friendless way of life" who has strange ideas about the powers of others and the occult.

Nelken depicted the mother as a dependent person, one who is highly reliant on others and, therefore, places herself under the control of another as to what to think or do. He referred to the home environment, consisting of the mother, the father and Flowers, as the "folie a trois"—shared craziness—existing within the "malignant psychology of the home." Nelken explained this concept as one in which people have convinced themselves that "we live in a world of witches and goblins" and that this outlook contaminates the rest of their lives.

Nelken felt that even though the mother's continued therapy was important, "the prospect that [such therapy] would provide a fundamental change in respondent mother is vanishingly small in this case, akin to 'impossible.' " He concluded that termination of the mother's parental rights was in the child's best interest. He did not feel that the break-up of the "folie a trois" would allow either parent to resume a parenting role since each individually would retain his or her beliefs. As to the mother, Nelken testified, "her own neediness is such an appalling problem for her . . . she can't focus on anything beyond that."

The mother called Flowers to testify. Flowers stated that she had resided with the family and had personally observed the mother spending time with Emmanuel, hugging him, giving him treats and telling him that she loved him.

## IV

### NEGLECT AND ABUSE ADJUDICATION

The petitioner asks the court to adjudicate Emmanuel as neglected "in that he is [being] denied proper care and attention physically and is being permitted to live under conditions, circumstances and associations injurious to his well being." The petitioner also alleges that Emmanuel is abused "in that he has had physical injuries inflicted upon him other than by accidental means" and that he "has injuries which are at variance with the history given of them and in a condition which is the result of maltreatment." General Statutes § 46b-120. All of these allegations are in support of the petitioner's claim that the court should adjudicate Emmanuel as neglected.

In order for this court to adjudicate a child as neglected, this court must be convinced by a fair preponderance of the evidence that the child has been

neglected. See Practice Book § 1043 as amended. The petitioner and the attorney for the minor child aver that the evidence at trial satisfies the fair preponderance of evidence standard required for an adjudication of neglect. Both of those parties point out that abuse, physical injury other than by accidental means, or injuries at variance with the history given them, exist in the present case. To support their position, they recite the following: (1) the paraffin found in Emmanuel's ear; (2) the cigarette burn on Emmanuel's wrist; (3) the burn on Emmanuel's right thigh; (4) other bruises on Emmanuel's body in various stages of healing; (5) the spiral fracture to Emmanuel's right femur; and, (6) the respondents' collective history of the cause of these injuries to Emmanuel inconsistent with the injuries themselves.

Both the petitioner and the attorney for Emmanuel argue that he has been denied proper care and attention. To support this position, they recite the following: (1) failure to bring Emmanuel to the hospital in a timely fashion for treatment of the leg fracture; (2) the mother's personal feelings toward the hospital staff and dealing with the father were held in higher regard than the need to seek immediate medical treatment for her son; and (3) the respondents' failure to recognize the amount of swelling in Emmanuel's leg and their delay in seeking medical treatment for him.

Finally, both the petitioner and the attorney for Emmanuel argue that he was allowed and permitted to live under circumstances that were injurious to his well-being. They claim this allegation is substantiated by the respondents' failure to keep Emmanuel away from the paternal grandmother who allegedly had been practicing voodoo on Emmanuel and who, by the respondent mother's own statement to various witnesses who had testified at trial, had placed the wax in Emmanuel's ear.

The father concedes that due to his present incarceration and his stipulation that he is suffering from a shared delusional paranoid disorder, sufficient grounds exist for Emmanuel's commitment to DCF on the neglect petition.

The mother's brief is silent as to specific argument regarding the neglect petition. Rather, the brief relies on all the arguments utilized in defending the termination of her parental rights.

The court finds that the petitioner has established by a fair preponderance of the evidence that Emmanuel has been neglected in that he has been abused, denied proper care and attention and permitted to live under circumstances or associations that were injurious to his well-being. The court finds credible the evidence relied on by the petitioner and the attorney for Emmanuel and adopts that evidence in adjudicating the minor child Emmanuel as neglected.

## V

### TERMINATION

### A

#### WAIVER OF THE ONE YEAR REQUIREMENT

Section 17a-112 (c) provides for the waiver of the one year requirement and states: "The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."

Determination of the question of a waiver is within the trial court's discretion. *In re Romance M.*, 30 Conn. App. 839, 622 A.2d 1047 (1993), appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1994). The use of psycholog-

ical evaluation in deciding the best interest of the child based on the totality of the circumstances is appropriate. Id., 857.

The court finds that on the basis of the aforementioned evidence as summarized in the brief of the counsel for the minor child: "The wax in the ear, the burns on his wrist and right thigh, the multiple bruises, the inadequately explained broken leg, the father's admission that he hit the child with a belt, and the multiple scars on his entire body," it is in Emmanuel's best interest to waive the one year statutory waiting period. *In re Christine F.*, 6 Conn. App. 360, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986).

## B

### AS TO THE RESPONDENTS

Having found Emmanuel to be neglected, the court must next look at termination of the parental rights of the respondents. Each statutory basis set out in § 17a-112 (b) for termination of parental rights is an independent ground for termination. *In re Baby Girl B*, 224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove the grounds for termination by clear and convincing evidence. *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 254.

As to each respondent, the petitioner here has alleged two separate statutory grounds for termination. They are as follows:

### 1

### Acts of Omission or Commission

This ground is established when the child has been denied by reason of act or acts of commission or omission by the mother or father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. As set out in § 17a-112 (b) (3):

"Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights. . . ." As the father points out in his brief: "A petition claiming a child has been denied necessary care, guidance or control by reason of parental acts of commission or omission, requires proof of specific conduct that has caused serious physical injury to the child." See *In re Kelly S.,* 29 Conn. App. 600, 615–16, 616 A.2d 1161 (1992). Specific conduct, however, can be proven through direct circumstantial evidence. The law does not distinguish between the two as far as probative force is concerned. *State* v. *Cimino,* 194 Conn. 210, 478 A.2d 1005 (1989). "The [standard of] 'clear and convincing proof' [used in the present case] denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 536–37, 368 A.2d 125 (1976).

In the present case, Emmanuel, the minor child, has sustained numerous injuries, including but not limited to burns and severe bruises and a spiral leg fracture. His body shows multiple scars indicating prior injuries as well. All medical experts who testified claim that Emmanuel's injuries, specifically, the spiral fracture, were inconsistent with the history provided by the respondents. Further, all medical experts who testified, as well as the two DCF workers who testified, stated that the respondents "changed their stories" on a number of occasions as to how their son obtained the injuries. Even with these changes, the medical experts stated that the physical injuries were inadequately explained. Further, according to Semmelrock's testimony, the father had made statements at various times that he was responsible for Emmanuel's injuries, but

he could not clearly recall when or how. Similarly, Flowers claimed at one point that she was responsible for Emmanuel's injuries.

While it is true that no one witnessed either the mother or the father directly cause Emmanuel's assorted injuries, such lack of direct evidence does not preclude this court, if it finds the evidence appropriate, to conclude that the respondents committed acts that endangered Emmanuel's well-being. Both respondents argue that there is no evidence that either of them caused the injury. Yet, neither respondent denies that Emmanuel suffered these injuries. Neither presented any evidence at trial to rebut the petitioner's expert medical testimony that the injuries were not accidental. Neither presented any evidence that Emmanuel was in the care of anyone other than the mother or the father when the injuries occurred.

Even if this court assumes, arguendo, that Emmanuel's injuries occurred while not in either respondent's care, then the respondents committed a parental act of omission by allowing Emmanuel to be in the care of another while his safety was not protected. The history of the present case shows that both respondents questioned the paternal grandmother's motives in relation to Emmanuel. There was discussion that she wanted to use Emmanuel as a human sacrifice. With this fear, why would the respondents subject their son to her presence later that same year when the grandmother allegedly put hot paraffin in Emmanuel's ear?

This court is faced with determining the truth from conflicting statements given by the respondents and expert medical testimony regarding the cause of Emmanuel's injuries. There is no question that Emmanuel has been seriously injured and abused. Lellman testified that the failure to seek immediate attention for the spiral fracture could have led to defor-

mity. Lellman further testified that he had to wait to "cast the leg" properly until the serious abrasion and bruise on the upper thigh was healed. This injury had to be debrided, scabbing scraped away and the wound cleaned and properly attended. Clearly, none of this would have been necessary if the respondents had sought immediate medical attention for this injury. It is apparent they did not, just as they did not seek immediate treatment for the leg fracture. All of these failures are omissions on the respondents' parts that were highly detrimental to Emmanuel.

The court finds unpersuasive the respondents' arguments that they did not cause Emmanuel's injuries. Similarly, this court finds ludicrous the father's argument that Emmanuel's injuries do not qualify as "serious physical injuries." Emmanuel was three years old, defenseless and in his physically developmental years. Any injury that could lead to infection or deformity if untreated is clearly serious. This court finds that the petitioner has proven and established this ground by clear and convincing evidence.

2

No Ongoing Parent-Child Relationship

This ground is established when, with the mother or father, there is no ongoing parent-child relationship, which is defined as the relationship that ordinarily develops as a result of a parent's having met on a continuing, day-to-day basis, the physical, emotional, moral and educational needs of the child, and, to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interest of the child.

There is ongoing parent-child relationship in a situation in which, regardless of fault, a child either has never known his or her parents, or in which no rela-

tionship has ever developed between them or has been lost, so that, despite its former existence, it has now been completely displaced. In any case, the ultimate question is "whether the child has no present memories or feelings for the natural parent." *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 420 A.2d 875 (1979). The mere recognition of an individual as a parent will not defeat this ground. *In re Juvenile Appeal (84-6),* 2 Conn. App. 705, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). The presence or absence of positive feelings on the part of the child is determinative.

Here, Ball, the DCF intake worker, testified that when she interviewed Emmanuel at the emergency room, he did not look at his parents. When they left the room, he did not ask for them to come back. Ball stated that in her experience it was unusual for a child in the hospital, generally a frightening situation, not to want his parents present. Moreover, Fazzino, the youth officer for the New London police department, confirmed that when he interviewed Emmanuel at the hospital, Emmanuel told him he did not want his mother or father in the room. When the child was removed from the hospital and was told that he was going to live somewhere else for a while, Ball testified that Emmanuel never mentioned his parents nor mentioned going home to them.

Semmelrock, the DCF treatment social worker, testified that she supervised visits between Emmanuel and his mother. She stated that the child was "guarded" during initial visits, but he later seemed more comfortable. She did note, however, that if the mother arrived and Emmanuel was already engaged in an activity, he paid little attention to her. Finally, Semmelrock testified that Emmanuel has not seen his father since February, 1993, as he is currently incarcerated. She stated that Emmanuel has never asked to see his father and

he has never brought up his name. Coincidentally, pictures of the father were taken approximately two weeks before trial and given to Emmanuel. Semmelrock indicated that the father had Emmanuel's address, but to her knowledge he had not communicated with his son.

Meier testified that Emmanuel was very young at the time of his psychiatric evaluation and, therefore, he received most of his information from the foster mother. Meier felt that Emmanuel did know his mother and that he showed some affection toward her. Meier felt, however, that there was guardedness in Emmanuel's responses to his mother and that his affection was "not as spontaneous as normal."

Nelken's testimony was that during his fairly extensive psychiatric interview with the mother, she mentioned Emmanuel in passing only once. He felt this was consistent with her own "neediness" and her inability to focus on anything beyond that.

Meier recommended termination of both parents' rights. He testified that the parents cannot rehabilitate themselves in a timely fashion and that Emmanuel should have stability and permanency in his life. He indicated that the mother needs long-term therapy for a number of years, and that the father has a psychotic disorder requiring long-term therapy and medication. The father's condition produces dangerous and delusional thoughts. Meier felt both parents' conditions would place Emmanuel in danger. Similarly, Nelken's professional recommendation was for termination of parental rights. He stated: "Termination is in the child's best interest no matter what." He felt no treatment was likely to alter the parents' delusions. Neither respondent offered any expert testimony to the contrary.

The petitioner has proven by clear and convincing evidence that neither respondent has developed an ongoing relationship with Emmanuel. Similarly, Emmanuel has not developed an ongoing relationship with either respondent. The petitioner has proven by clear and convincing evidence that further time to establish such relationship would be detrimental to Emmanuel's best interest.

## VI

### BEST INTEREST OF THE CHILD

The court has found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of both of the respondents' parental rights have been proven. Proof of any one of these grounds as to each respondent would have been sufficient. The court must now consider and make findings on each of the seven criteria set out in § 17a-112 (d) as amended. These criteria and this court's finding are as follows: (1) Services Offered—Services offered to each of the respondents were limited due to their respective circumstances. The father initially received medical attention at the U.S. naval hospital in Bethesda, Maryland. He receives therapy in the medical ward in the facility in which he is presently incarcerated. The mother is in the AIC program that requires daily attendance where she takes classes in parenting, nutrition, and family and parent in crisis instruction. DCF also arranged weekly visitations for her with Emmanuel; (2) Effort for Reunification—DCF determined that due to the parents' respective psychiatric evaluations, the services the family had utilized and the quality of the relationship between the parents and Emmanuel, that reunification was not in Emmanuel's best interests; (3) Court Orders—Aside from court-ordered evaluations with which the respondents cooperated, there were no other court orders; (4) Feelings and

Emotional Ties—Emmanuel appears to have no emotional ties with his father. He has not seen him for ten months and neither asks to see him nor asks about him. Emmanuel seems to enjoy his supervised visits with his mother, but he also separates from her easily when the visits end. He has not asked to see her more frequently nor has he questioned anyone about returning home to live with her or his father; (5) Age of the Child—Emmanuel was born December 17, 1989. He has been in foster care for ten months; (6) Efforts to Adjust—Both respondents are seeing counselors. Due to the extent of each respondent's mental health problems, however, it is unlikely that either would be able to change sufficiently within any reasonable time period in order to parent Emmanuel effectively; (7) Interference with Relationship—There is no evidence that supports that the petitioners or anyone else interfered with either respondent's ability to maintain a relationship with Emmanuel. There were limitations on the father and the mother due to incarceration and involvement with the AIC program respectively. There is no evidence that economic factors affected the situation.

The court finds that the evidence is clear that the best interest of Emmanuel is served by the termination of both his mother's and his father's parental rights.

## VII

### CONCLUSION

Judgment may enter adjudicating Emmanuel as neglected. This coterminous petition seeking the termination of the mother's and the father's parental rights with respect to Emmanuel is hereby granted. Judgment may enter terminating both respondents' parental rights in Emmanuel. Pursuant to § 17a-112 (f), it is ordered further that DCF be appointed statutory parent so that Emmanuel can be placed for adoption. The statutory parent shall report to the court within

ninety days on a case plan for Emmanuel and shall submit reports at least every twelve months thereafter until such time as any proposed adoption plan has become final.